This time we'll hear First Technology Capital versus Airborne. Good morning, Your Honor. The audience is leaving. Maybe that's because there's only one party here arguing. I don't know. Well, that may be. Maybe they don't think your case is very interesting. It's a very simple case. May it please the Court, my name is Michael Gartland. I'm here on behalf of First Technology Capital, Inc., which I will refer to as FTC. Your Honor, this case is about a sale of an airplane. And at the time FTC sold it to First Flight, it didn't know that it was actually resold downstream to a Middle Eastern buyer that we don't even know who they are. But what happened here, and this is what happened. Before the contract was entered into, approximately three days, my client's predecessor, Doherty Air, who owned the airplane, sent 925 pages, 28 PDFs of specifications on our plane to First Flight's agent, Tailwind, who sent them to First Flight. First Flight checked them, spot checked them, was confirmed for itself the specs related to our airplane. Those same specifications, 925 pages, 28 PDFs, ultimately made their way to the Middle East. We know this because of discovery. We didn't know this before the case was started. The Middle Eastern buyer looked at those specs, and 12 hours later entered into a contract to buy the same plane. So in other words, First Flight sold the plane downstream. After it got its purchase agreement in order, it came to us the same day and agreed to buy the plane. And its goal was to make a quick $850,000. It agreed to buy it for us for $2.15 million and sell it downstream for $3 million. And First Flight, what happened then is they attached six pages of summary specs of a plane that's not our plane. How did that happen? Is it in the record? It's in affidavits that are not part of the appendix, but they're in the record, and we've cited them in connection with our summary judgment reformation. What happened? Well, there's two different versions of the story. The first version was Mr. Dow, who was the director of airplane sales for First Flight, said when the Middle Eastern buyer got these specifications, the 925 pages, he was too lazy and tired and didn't want to look at them. So he reached out and said, can you get me some summary specs? And Mr. Dow testified that he got a hold of somebody in Denver called Clark Onstad, and Clark Onstad sent him these summary specifications, which he claimed later. Dow claimed went to the Middle East, but we know that that's not true. That's his first affidavit. His second affidavit's slightly different. But in any event, we know the specifications came from Denver to First Flight, and First Flight attached them to the contract, sent that to Dorothy Ayer, who was our predecessor, who looked at them. He looked at the last page. The last page is actually one of the 925 pages. It references the tail number on the plane and the two serial numbers of the engines. So he believed that they related to his airplane that he was selling. So he signed the contract and sent it back. In connection with that e-mail back to ---- Wasn't it alleged that both sides had a mutual mistake here about those specs? That's true, and that's why we have a right to reformation under Second Circuit law. I mean, there's no question First Flight admitted in their answer, in response to Paragraph 28, that it believed that the summary specs were the specs for our plane. And Dorothy, in Paragraph 31 of our complaint, we allege that he believed Al Wyhock. You don't set out mutual mistake and reformation as the cause of action in the complaint, right? The complaint only has one cause of action, breach of contract. Why didn't you allege reformation as a basis for relief here? Well, we did, but it was only after we got into discovery and we learned more facts about what really happened. And it's true. It's not in our complaint, but under the Smith v. Bair case, it doesn't matter because we've alleged mutual mistake. We're allowed to proceed with reformation. So did you amend the complaint? We didn't seek to, no. We moved for summary judgment on reformation instead. So it was kind of procedurally a strange case. Discovery is ongoing. They file a motion for judgment on the pleadings. We opposed that. We asked the court to convert it to a motion for summary judgment, which Judge Wolford ultimately refused to do. But then we filed two summary judgment motions in October, shortly within five months of this case being filed. We filed one on their perfect tender defense. We say we want summary judgment that their perfect tender defense is a sham. And then four weeks later exactly, we moved for summary judgment on reformation. And what happened here is the judge refused to even consider our reformation and she granted judgment on the pleadings, which we say was a mistake because you have to figure out which contract to party. Which doctrine should be decided first? Perfect tender, which is based upon the pleadings, or reformation and mutual mistake? Well, reformation has to be decided first because you've got to decide whether or not we fail to tender the correct plane. And they were relying on the summary specs to say we couldn't tender the correct plane. And we say, but if you substitute the correct specs, the specs that they actually reviewed, the specs that their downstream buyer was satisfied with, because their interest in the specifications was equivalent and only equal to the downstream buyer. Mr. Dow testified. We weren't going to own the plane. We wanted to flip it. We were only interested in getting the downstream buyer the plane with the specifications that he wanted. And we know the downstream buyer signed a contract within hours of getting these 925 pages. So our request was to substitute the 925 pages for the six pages that was behind the contract. You have to decide that issue first before you can decide whether or not they're entitled to judgment on the pleadings. And if you do substitute, they would never get judgment on the pleadings. We would get summary judgment. Are you able, under the New York UCC, to contradict the terms of the contract that was signed? In other words, you're not seeking to add terms to the contract. You're seeking to contradict the terms, aren't you? No. We're seeking to make, if you look at the three-page contract, the first page of it describes our plane. It's our tail number, our engine serial numbers, et cetera. We're not trying to contradict it. We're trying to get the party's true intention, which was to sell, for us to sell, for them to buy and for them to sell again our plane. But the Annex 1, which is really the problem here. The technical summaries. Right. You're seeking to say Annex 1 is not the right annex. Some other document that we're going to prove by parallel evidence is the accurate specifications. And by doing that, aren't you contradicting the terms of the agreement to the extent that the annex is part of the agreement? If you keep the annex in, the answer is yes. But the annex needs to come out, and the 925 pages needs to go behind that contract. Right. So you're contradicting. The question really is, ultimately, can you prevail on reformation under the New York UCC? Yes. And that's not . . . nobody even argued what you're arguing or raising with us. They merely argued there was no meeting in the minds. And we think through the summary . . . The Court's decision to follow up on Judge Underhill is that the specific language of the contract says there will be no deviation from the specification. That's true. What do you have to say about that? How do you get around that? Again, it was a mutual mistake that the summary specs were even attached. And both parties agree it was a mutual mistake. And if we reform the contract to put the correct ones, then there would be no deviation from the specs. I take it your argument is that you had an agreement with respect . . . an analogy. You have an agreement with respect to an airplane, and you identify it, and the acceptance attaches specs for a lawnmower. And that, obviously, is not what the parties intended, and therefore, it should be reformed. That's correct. And the evidence was overwhelming that everybody relied on the 925 pages of specs, which were our plane. The downstream buyer relied on them. It signed a contract, and then they signed a contract. Did the contract that came back to you, which had the specs which you say don't conform to the parties' understanding, did that contract also contain the number of the airplane and the serial numbers of the engines . . . Yes. . . . that conformed to the plane that your client was . . . If you look at the last page of the technical summaries, it's actually seven pages. We said six in our brief, but there's a seventh page. Whatever. The seventh page is a page that was part of the 925. It actually has our tail number and the serial numbers of our engines on our plane, the very last page. And a tail number is unique in the world. There's only one. It's N973TW. The reason I know that is there was another case with the same airplane involved, which preceded this litigation. Yes. It's the only plane in the world with that tail number, and it's the only two engines in the world with that serial number. And those are part of the specifications that are attached to the contract. That's the seventh page. It turns out your case is interesting after all. It's actually a simple case, but it got messed up when somebody attached the wrong specifications to the plane that nobody intended to rely on. That's our theory of the case. Thank you. We will reserve decision.